## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **MICHAEL L. MATTICE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:13-01441** |
| **v.** | ) | **Judge Nixon/Brown** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **ACTING COMMISSIONER** | ) | |
| **OF SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**To: The Honorable John T. Nixon, Senior United States District Judge**

### REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration ("the SSA"), through its Commissioner ("the Commissioner"), denying plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i), 423(d). For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the record (Doc. 10) be **DENIED** and the Commissioner's decision **AFFIRMED**.

### I. PROCEDURAL HISTORY

Plaintiff filed an application for DIB on May 15, 2013 alleging a disability onset date of March 29, 2013. (Doc. 8, p. 156)[1] Plaintiff claimed that he was unable to work because of a major depressive disorder, severe depressive disorder, social anxiety, post-traumatic stress disorder (PTSD), etc. (Doc. 8, p. 160) Plaintiff's claims were denied initially on July 8, 2013 and again upon reconsideration on July 24, 2013. (Doc. 8, pp. 73-76, 78-80)

---

[1] References to page numbers in the Administrative Record (Doc. 8) are to the page numbers that appear in **bold** in the lower right corner of each page.

Plaintiff filed a request on July 30, 2013 for a hearing before an Administrative Law Judge (ALJ). (Doc. 8, pp. 81-82) A hearing was held on August 30, 2013 in Nashville before ALJ David A. Ettinger. (Doc. 8, pp. 24-43) Vocational expert (VE) Kenneth N. Anchor testified at the hearing. (Doc. 8, pp. 39-42)

The ALJ entered an unfavorable decision on October 1, 2013. (Doc. 8, pp. 8-23) Plaintiff filed a request with the Appeals Council on November 12, 2013 to review the ALJ's decision. (Doc. 8, p. 7) The Appeals Council denied plaintiff's request on November 20, 2013, whereupon the ALJ's decision became the final decision of the Commissioner. (Doc. 8, pp. 1-6)

Counsel brought this action on plaintiff's behalf on December 20, 2013. (Doc. 1) Plaintiff filed a motion for judgment on the administrative record on April 2, 2014. (Doc. 10) The Commissioner responded on April 30, 2014.[2] (Doc. 12) Plaintiff did not file a reply. This matter is now properly before the court.

## II. REVIEW OF THE RECORD[3]

### A. Medical Evidence

Plaintiff was a walk-in patient at the Vilseck Army Health Clinic in Germany on July 23, 2009. (Doc. 8, p. 377) He had been "discharged from a German Psychiatric Hospital on Monday 20 July following an OD on Saturday 18 July 2009." (Doc. 8, p. 377) Plaintiff attempted suicide by taking Morphine tablets after drinking. (Doc. 8, p. 378) Dr. Terry Moody, Ph.D., diagnosed plaintiff with "Major Depressive Disorder, Single Episode" and "Panic Disorder with Agoraphobia." (Doc. 8, p. 379)

---

[2] Neither party numbered the pages in their pleadings (Docs. 10-12). The pages referred to in these documents are those assigned by the Court's CM/ECF system.

[3] Plaintiff raises two claims of error in these proceedings, both of which pertain to his diagnosed depressive disorder. The review of the record below is tailored to those claims of error.

Plaintiff was admitted to the Landstuhl Regional Medical Center (RMC) in Germany approximately two years later on May 21, 2011. (Doc. 8, pp. 382-83) Plaintiff had "developed thoughts of suicide," and paramedics took him to the hospital. (Doc. 8, p. 382) He was discharged from RMC Landstuhl on May 23, 2011 for further treatment at Vilseck. (Doc. 8, p. 383)

Plaintiff transferred from Germany to Ft. Campbell where he reported for duty on October 8, 2012. (Doc. 8, p. 267) He presented Blanchfield Army Community Hospital for medical "in-processing" on October 15, 2012. (Doc. 8, pp. 272-75) Plaintiff reported that he had been "feeling 'good'" "since he was placed on Abilify and the dosage . . . increased to 25mg," and he denied having any current suicidal ideations (SI), or having had any within the previous 90 days. (Doc. 8, pp. 272-73) Plaintiff reported that he "fe[lt] ready to deploy . . . [and] . . . denied any behavioral health concerns . . . ." (Doc. 8, p. 273) Plaintiff continued in-processing the next day, at which time he repeated he was "doing well, better than he ha[d] been in a long time" and that, although he had a "passive" SI the prior weekend, he denied any current SI. (Doc. 8, p. 279) Plaintiff also reported that he continued to "deal with deployment related symptoms of nightmares," and experienced "anxiety with fireworks, artillery . . . crowds and being hyper alert." (Doc. 8, p. 279)

Nurse Practitioner (NP) Joel McPherson treated plaintiff numerous times at Ft. Campbell for mental health issues from November 8, 2012 to June 14, 2013. (Doc. 8, pp. 227-41, 245-47, 258-71, 276-77, 318-21, 326-27) Plaintiff reported on November 8th that he currently felt "good" and denied any SI. (Doc. 8, p. 267) Plaintiff also reported that, although he was able to get only "4-5 hours of broken sleep nightly," he no longer had "nightmares." (Doc. 8, p. 267) Plaintiff reported further that he "was having difficulty with low energy, poor concentration . . . problems completing task[s]," and that he had to take a nap every afternoon. (Doc. 8, pp. 267-68)

On December 11, 2012, plaintiff characterized fatigue as his primary problem. (Doc. 8, pp.

264-66)  He reported to NP McPherson that he was "'tired all the time,'" and that he had been "constantly tired for over a year." (Doc. 8, p. 264)  Plaintiff again denied any SI, and reported that Abilify was "very helpful with relieving depression."[4] (Doc. 8, p. 264)

Plaintiff presented to NP McPherson on January 9, 2012 for side effects from having "stopped" Abilify.[5] (Doc. 8, p. 261)  Plaintiff reported that he had been "on Celexa for years" and that it did "a good job of regulating emotions." (Doc. 8, p. 261)  Plaintiff also reported that he did not "get irritated too easily," but that he continued "to be tired," and liked "to nap after work." (Doc. 8, p. 261)  Plaintiff claimed that fatigue had "always been a problem." (Doc. 8, p. 261)

Plaintiff was seen by NP McPherson for anxiety on February 5, 2013.  (Doc. 8, p. 258) Plaintiff complained that, although everything was going well in general, that particular day was "very anxitizing." (Doc. 8, p. 258) Plaintiff expressed his view that he did not have the "knowledge or confidence" of "his peers," that his  expectations were "unrealistic," that he had "no plans" after the Army, and that he felt being discharged would be a demotion.  (Doc. 8, p. 259)

Dr. Joann Quintero, Ph.D., whose treatment of plaintiff is discussed below at pp. 7-10, reviewed plaintiff's medical records on February 19, 2013 at the request of the Brigade Surgeon who "suggested' that plaintiff "may be best served with an MEB [Medical Evaluation Board]." (Doc. 8, p. 255)  Dr. Quintero concurred in the Brigade Surgeon's suggestion based on her review of the records.[6]  (Doc. 8, p. 255)

On February 26, 2013, plaintiff reported to NP McPherson that he was "doing well" and had

---

[4]  The record reads that plaintiff "tapered Abilify to stay active military." (Doc. 8, p. 264)

[5]  The January 9, 2013 record shows that "Abilify was stopped" "about 4 weeks" prior, *i.e.*, on December 11th, not just reduced as the term "tapered" in n. 4 above implies.  (Doc. 8, p. 261)

[6]  Plaintiff's case was referred formally to the MEB on March 29, 2013 for "MAJOR DEPRESSIVE DISORDER." (Doc. 8, p. 391)

"no acute concerns." (Doc. 8, p. 277) Plaintiff also reported that he was not having any problems with his medications. (Doc. 8, p. 277)

On March 27, 2013, plaintiff reported to NP McPherson that he felt depressed, and that he slept "all the time." (Doc. 8, p. 245) Plaintiff also stated that "he will be on MEB," and that he was "very anxious" about life after the Army because he had no idea of what he could do. (Doc. 8, p. 245) NP McPherson ordered that plaintiff resume taking Abilify. (Doc. 8, p. 246)

Plaintiff reported to NP McPherson on April 10, 2013 that, although he continued to be depressed, he had not had SI visual images since resuming Abilify. (Doc. 8, p. 238) Plaintiff also reported that he was "sleepy much of the time,"and that he ate "if hungry." (Doc. 8, p. 238) Plaintiff stated that he was afraid "something bad will happen," especially when driving, that he was "very anxious," that he was easily startled by "by people walking up on him" and "loud noises," and that his disturbing thoughts were triggered by such things as a "box on the road side, being in crowds, loud noises, [and] fireworks . . . ." (Doc. 8, p. 239) Plaintiff also reported that his depression had increased "since being notified he will be getting out of the [A]rmy." (Doc. 8, p. 239)

On April 24, 2013, plaintiff reported to NP McPherson that Celexa and Abilify "work[ed] well together to help control his depression and thoughts of suicide," and the combination of Celexa and Ability was "'just right.'" (Doc. 8, p. 233) Plaintiff reported that, although his medication caused him to be "very tired in the mornings," he was "better after 0700." (Doc. 8, p. 233) Plaintiff reported further that his SI were no longer "daily occurrences" and, whereas they previously had been "intense," they now were "fleeting." (Doc. 8, p. 233)

Plaintiff reported on April 29, 2013 that his anxiety was much better with Gabapentin, although it caused fatigue. (Doc. 8, p. 276) Plaintiff told NP McPherson that he took the

Gabapentin with his other prescription medications before going to bed at night "to take advantage of the associated drowsiness" and to avoid being drowsy the next day. (Doc. 8, p. 276)

On May 2, 2013, plaintiff reported to NP McPherson that he continued to have "problems with concentration and focus," that he had "difficulty" completing tasks, or simple tasks that he did not like, and that he would have "several task[s] going at one time with difficulty finishing any of them." (Doc. 8, p. 231) Plaintiff reported that, although he was "tired much of the day," he had enrolled in an associates program, but was having "difficulty with attention," and that before he joined the Army, he had "difficulty with fidgety and impulsive be[h]avior, but not so much now." (Doc. 8, p. 231)

Plaintiff reported to NP McPherson on May 10, 2012: "I'm perfect now." (Doc. 8, p. 227) Plaintiff reported further that, although he still was having "intrusive thoughts" about twice weekly, and nightmares "concerning battle" about three times a month, he otherwise was "doing 'great,' sleeping well, [and] eating well three meals a day." (Doc. 8, p. 227) On June 6, 2013, plaintiff again reported that he was "eating and sleeping well." (Doc. 8, p. 326)

Plaintiff presented to NP McPherson with "uncontrolled anxiety" on June 14, 2013. (Doc. 8, p. 318) Plaintiff reported that he had "received his unfit memo" and that "[t]ransitional leave [wa]s to start in 3 months." (Doc. 8, p. 318) Plaintiff reported again that he got very anxious when he received bad news, or was "among groups of people," that he got anxious and irritated easily especially when in traffic and at home, and that he continued to have frequent SI. (Doc. 8, pp. 318-19) NP McPherson noted that plaintiff was "a little down due to an upcoming 24hr shift." (Doc. 8, p. 319)

Plaintiff carried the diagnosis of moderate recurrent major depression throughout his treatment by NP McPherson described above. (Doc. 8, pp. 227, 231, 233, 238, 245, 258, 261, 264,

267, 276-77, 318, 326)  Despite plaintiff's reported ups and downs with SI, depression, and anxiety, NP McPherson consistently assessed plaintiff as having "[n]o significant risk" of committing suicide. (Doc. 8, pp. 229, 235, 240, 259, 262, 265, 270, 320)   Although NP McPherson characterized plaintiff's mood variously during this period as "euthymic,"[7] "tired," "good," "down," "depressed," "dysphoric,"[8] and "Bla," he consistently assessed plaintiff's "behavior" as "cooperative and appropriate," his thought process as "logical and organized," his thought content without "evidence of psychosis or delusional thinking," his "concentration" as "good," his "attention" as "alert," and that he was "oriented" as to person, place, time, and circumstances (Ox4).  (Doc. 8, pp. 228, 231, 234, 239-40, 246, 259, 265, 269, 319)

Dr. Quintero treated plaintiff numerous times during the period March 22 to July 26, 2013. (Doc. 8, pp. 242-44, 248, 249-53, 254-55, 287-301, 307, 308-09, 313-17, 322-25, 328-35, 345-48, 539-42)  Plaintiff first presented to Dr. Quintero on March 22, 2013 on referral from the MEB. (Doc. 8, pp. 249, 251)  Plaintiff stated that "he would like to stay in the Army [for the] structure and financial security for his son."  (Doc. 8, p. 251)   Plaintiff acknowledged "3 prior psychiatric hospitalizations and past suicide attempt . . . ."[9]  (Doc. 8, p. 251)  He also stated that he had no intent to commit suicide because, among other things, he had a son who needed him, a sentiment repeated throughout Dr. Quintero's subsequent records.  (Doc. 8, pp. 251, 292, 295, 309, 314, 323, 329, 333)

On March 25, 2013, plaintiff reported to Dr. Quintero that he had not had any recent SI. (Doc. 8, p. 248)  He added, however, that he was "pretty sad and depressed when he learned of the MEB," and that he "had a few panic attacks over the weekend."  (Doc. 8, p. 248)

---

[7] Euthymic – "state of mental tranquility and well-being; neither depressed nor manic." *Dorland's Illustrated Medical Dictionary* 655 (32nd ed. 2012).

[8] Dysphonic – "difficulty in speaking . . . ." *Dorland's* at 579.

[9] Only two hospitalizations are indicated in the record.

Plaintiff presented with "depression" on April 1, 2013 (Doc. 8, p. 242), and with "increasing depression and anxiety" on April 10, 2013 (Doc. 8, p. 299). Plaintiff reported on April 10th that he had experienced "increased panic attacks" two weeks earlier. (Doc. 8, p.. 299)

Plaintiff reported to Dr. Quintero on April 24, 2013 that "his depression [wa]s increasing," that he had experienced an "increase in his suicidal visions" the day before that "were the worst" he ever had experienced. (Doc. 8, p. 295) Plaintiff believed that the "stressor" was that he had "nothing to do all day at work," that he did "not feel useful," and that he "literally walk[ed] around all day . . . find[ing] ways to spend his time . . . ." (Doc. 8, p. 295) Dr. Quintero made the specific note that plaintiff's "affect" was "incongruent" with his "mood," *i.e.*, that, although "he reported being depressed, his affect appeared happy, he was smiling and joking." (Doc. 8, p. 295) Dr. Quintero also noted that plaintiff was looking forward to his future after the Army, another oft-repeated observation in her records. (Doc. 8, pp. 244, 293, 297, 300, 309, 314, 323, 329, 333, 348, 355, 541)

On May 15, 2013, plaintiff reported that he had experienced problems with anger "his whole life," but that he had "gotten much better" managing it over the years. (Doc. 8, p. 289) Dr. Quintero reported that plaintiff was "compliant with meds and therapy," and "ha[d] been stable for many months . . . ." (Doc. 8, p. 288) Dr. Quintero made specific note that, although plaintiff reported anger issues, he did not report any problems with colleagues. (Doc. 8, p. 288)

On May 22, 2013, plaintiff represented that he wanted to work after the Army, but was afraid his anxiety was so bad he will not be able to. (Doc. 8, p. 346) He stated that he thought of suicide "because he ha[d] 'done nothing worthwhile,'" that he had failed at everything he had done, and that he considered suicide the "ultimate escape if things get too bad." (Doc. 8, p. 346) The "ultimate escape" theme also is repeated throughout Dr. Quintero's records. (Doc. 8, pp. 322, 332, 346)

Plaintiff also reported that, since "he cannot do his job in the Army, he has a 'pointless existence.'" (Doc. 8, p. 346)  Finally, plaintiff expressed anxiety and that, the further he was from home, the more anxious he became.  (Doc. 8, p. 346)

Dr. Quintero telephoned plaintiff on May 24, 2013 for a "safety check."  (Doc. 8, p. 345) Plaintiff reported that he and his wife were "doing well."  (Doc. 8, p. 345)  Dr. Quintero noted that, although plaintiff had "a difficult time" the day before with SI, he had been "camping . . . with his wife and kids," his "Affect/Mood sounded better," and he reported that "he was doing just fine." (Doc. 8, p. 345)  On May 30, 2013, plaintiff reported to Dr. Quintero that he "continue[d] to have thoughts of suicide."  (Doc. 8, p. 332)

Plaintiff presented to Dr. Quintero on June 5, 2013, accompanied by his wife.  (Doc. 8, p. 328)  Plaintiff's wife "admitted that she was worried about him" a few weeks earlier when he was having a panic attack, because she was at work and "could not do anything to help him."  (Doc. 8, p. 328)  On June 12, 2013, Plaintiff reported, "now that he is getting out of the Army, his no longer useful to anyone and . . . maybe he should move up his 'suicide age.'" (Doc. 8, p. 322)  On June 25, 2013, plaintiff reported that "today is a good day" and that he felt "pretty good."  (Doc. 8, p. 313)

On July 9, 2013, plaintiff presented with depression and chronic thoughts of suicide.  (Doc. 8, p. 308)  On July 26, 2013, plaintiff reported to Dr. Quintero that he was "doing okay."  (Doc. 8, p. 539)  Plaintiff denied any suicide ideations that day.  (Doc. 8, p. 539)  Plaintiff also reported that he and his wife were moving, that he was having to do "most of the cleaning of the old house and setting up of the new house" which "frustrated him, but acknowledged that he understood his wife could not help because of her work schedule.  (Doc. 8, p. 539)

Plaintiff carried the diagnosis of moderate recurrent major depression throughout the time Dr. Quintero treated him.  (Doc. 8, pp. 243, 249, 252, 255, 292, 296, 299, 308, 314, 323, 328, 347,

540)  Despite plaintiff's reported bouts with SI, depression, and anxiety, Dr. Quintero consistently assessed plaintiff's suicide risk as "mild" to "moderate." (Doc. 8, pp. 243, 292, 296, 300, 309, 314, 323, 329, 333, 346, 541)  Although Dr. Quintero characterized plaintiff's "mood" during this period variously as "slightly depressed," "euthymic," "calm," "anxious," depressed," "frustrated," "happy," "dysphonic," and "unhappy," and his corresponding "affect" as "normal," "broad," "congruent," "incongruent," "full ranging," and "sad," she consistently assessed plaintiff's "attitude" as "[n]ot abnormal," and both his "thought process" and "thought content" as "not impaired."  (Doc. 8, pp. 242, 251-52, 291, 295, 313, 322, 332, 347, 539)

The MEB issued its report on April 29, 2013.  (Doc. 8, pp. 371-76)  The MEB's general assessment is quoted below:

> [Staff Sergeant] Mattice's depression results in decreased motivation and decreased confidence.  As such, his ability to lead is decreased. His symptoms are exacerbated by high stress environments including combat related activities.  His symptoms of dizziness and syncope are also heightened during times of physical exertion.  He is taking multiple medications which cause drowsiness, [and which] could potentially impact his decision making abilities and limit his duty day.  Per the functions of his profile, his depression limits him from having a weapon and he could not safely live in an austere environment without worsening his condition.

(Doc. 8, p. 375)  The MEB concluded that plaintiff was not "able to return to active duty soldiering," and that he would "continue to require counseling and medication for his symptoms of depression." (Doc. 8, p. 375)  The findings of the MEB were approved on May 15, 2013.  (Doc. 8, p. 373)

Plaintiff's case was referred to the Integrated Disability Evaluation System (IDES), a joint Veterans Affairs/Department of Defense (VA/DOD) disability evaluation board.  (Doc. 8, pp. 391, 507)  Dr. Aileen McAlister, M.D., B.S., examined plaintiff on April 18, 2013 in response to the MEB's referral.  (Doc. 8, pp. 461-79)  Dr. McAlister determined that plaintiff's limitations/restrictions with respect to activities of daily living ranged from "none" to "slight" in

eight of the ten categories assessed, but "moderate" in the areas of "shopping" and "other recreational activities.  (Doc. 8, p. 472)

Dr. McAlister noted that plaintiff was currently employed full time in the Army, that he had not reported lost time in the past previous months, and he "pull[s] staff duty with no difficulty." (Doc. 8, p. 475)  Dr. McAlister also answered "No" to the question, "IS THERE TOTAL OCCUPATIONAL AND SOCIAL IMPAIRMENT DUE TO MENTAL DISORDER SIGNS AND SYMPTOMS,"but "Yes" to the question, "DO MENTAL DISORDER SIGNS AND SYMPTOMS RESULT IN DEFICIENCIES IN . . . FAMILY RELATIONS . . . [and] . . . MOOD . . . ?"  (Doc. 8, p. 478)  Dr. McAlister concluded by noting:

> This soldier . . . require[d] contin[u]ed med management and consistent psychotherapy to function in the Army since 2009.  He would need similar structure and continued psychotherapy and med management to function outside the military setting.  Without such structure and support in place for at least 12 months following discharge from the Army, there is a greater than 50% probability that he would have reduced reliability and productivity in any occupational environment.

(Doc. 8, p. 479)[10]  The ALJ gave "great weight" to Dr. McAlister's opinion.  (Doc. 8, p. 18)

Dr. Rebecca Joslin, Ed.D., a non-examining State Agency psychological consultant, completed a Medically Determinable Impairments and Severity (MDI) assessment on July 1, 2013. (Doc. 8, pp. 49-50)  Dr. Joslin reported in the MDI that, in the context of the paragraph B criteria, plaintiff had "moderate" restrictions in activities of daily living, "moderate" difficulties in maintaining social functioning, "moderate" difficulties in maintaining concentration, persistence,

---

[10]  The VA reported its estimate of plaintiff's VA benefits on June 15, 2013.  (Doc. 8, pp. 555-72)  The VA proposed fifty percent disability for plaintiff's "Major Depressive Disorder."  (Doc. 8, p. 567)  The Magistrate Judge notes for the record that the Commissioner is not bound by the VA's disability determination.  *See LiRiccia v. Comm'r of Soc. Sec.*, 549 Fed.Appx. 377 at * 9, 2013 WL 6570777 (6th Cir. 2013)(citing 20 C.F.R. § 404.1504; *Stewart v. Heckler*, 730 F.2d 1065 (6th Cir.1984)).

or pace, and that there had been "[o]ne or [o]wo" episodes of decompensation of extended duration. (Doc. 8, p. 49-50)  Dr. Joslin also reported that the evidence did "not establish the presence of the 'C' criteria."  (Doc. 8, p. 50)

Dr. Joslin reported in the accompanying mental residual functional capacity (RFC) assessment that plaintiff had limitations/restrictions in his ability to sustain concentration and persistence, *i.e.*, moderate limitations/restrictions in his ability to maintain attention and concentration for extended periods, in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and in his ability to perform at a consistent pace without an unreasonable number and length of rest periods.  (Doc. 8, p. 52)  Dr. Joslin also noted, however, that plaintiff was "able to maintain attention, concentration, persistence and pace with approp[riate] breaks **despite** periods of increased signs and s[ymptom]s."  (Doc. 8, p. 52)(emphasis added)

Dr. Joslin also determined that plaintiff had social interaction limitations/restrictions, *i.e.*, marked limitations in his ability to interact appropriately with the general public, and moderate limitations in his ability to accept instructions and respond appropriately to criticism from supervisors, as well as in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Doc. 8, pp. 52-53)  Dr. Joslin concluded that plaintiff "should not interact directly with the general public, that feedback should be given in a "supportive manner," and that he was able to interact with coworkers an supervisors on an "occasional basis."  (Doc. 8, p. 53)

Finally, Dr. Joslin determined that plaintiff had adaptation limitations/restrictions, *i.e.*, that he had moderate limitations in his ability to respond to changes in the work setting.  (Doc. 8, p. 53) Dr. Joslin noted, however, that plaintiff was "able to adapt to infrequent changes in the workplace."

(Doc. 8, p. 53)

Dr. C. Warren Thompson, Ph.D., affirmed Dr. Joslin's assessment on July 23, 2013. (Doc. 8, pp. 62-67) The ALJ "accept[ed] the opinions of Dr. Joslin and Dr. Thompson." (Doc. 8, p. 18)

## B. Transcript of the Hearing

Plaintiff testified upon questioning by counsel that he had been an infantryman in Iraq, after which he began to develop "depressive-type issues" in 2009. (Doc. 8, p. 29) He was assigned to support the Warrior Transition Unit (WTU) in Germany after he tried to commit suicide,[11] but was "unable to function" in that assignment due to severe depression. (Doc. 8, p. 30) Plaintiff also testified that since being assigned to Ft. Campbell, he goes to the base in the morning, goes home, and "do[es]n't do anything." (Doc. 8, p. 30)

Plaintiff testified that he transferred to Ft. Campbell in 2008 at his request to be closer to his son. (Doc. 8, p. 31) After returning to "doing combat-related stuff," plaintiff became so "stressed out" that the decision was made to assign him to the WTU. (Doc. 8, pp. 31-32)

Plaintiff testified that, although there "are times when he do[es] well . . . he consistently . . . [has] . . . daily . . . suicidal idea[]tions. . . . [but] . . . [s]ome days are better than others." (Doc. 8, p. 32) He admitted having denied SI to counselors in the past, because he "wanted to stay in the Army. . . ." (Doc. 8, pp. 32-33)

Plaintiff testified that he liked the structure offered by the Army, and he did not know what he would do if he had to get out because he was unable to "deal with the people." (Doc. 8, p. 33) Plaintiff clarified that, although he no longer felt like he belonged, "the structure" of the Army made "everything just a little bit better . . . ." (Doc. 8, p. 33)

---

[11] Plaintiff testified that he was "committed to a hospital in Germany for two weeks" after his suicide attempt. There is no documented medical evidence in the record that plaintiff was hospitalized for two weeks.

Plaintiff testified that he was in "better moods" some days than others. (Doc. 8, p. 33) Plaintiff testified further that, even on good days, having to "look people in the eye [wa]s really hard," but on bad days he had to leave work, because he would be "crying," "shaking," "twitching." (Doc. 8, pp. 33-34) When counsel asked how many bad days he had, plaintiff replied: "That depends . . . I could have a bad day for a straight week, where I'm just crying my eyes out all week, or I could go a week where I'm fine . . . or I just think about killing myself . . . ." (Doc. 8, p. 34)

Plaintiff testified upon questioning by the ALJ that he had been enrolled in a University of Phoenix online program in 2009, but that he quit because he was "unable to concentrate" and make "passing grades." (Doc. 8, pp. 35-36) The ALJ asked plaintiff if he had any in-patient psychiatric care since he was in the hospital in Germany in 2009. (Doc. 8, p. 38) Plaintiff answered, "No," adding: "I don't have to go to work . . . [s]o instead of being . . . [an] . . . in-patient, I just stay at home . . . with my wife." (Doc. 8, p. 38)

At the conclusion of counsel's brief redirect, the ALJ posed the following hypothetical to the VE:

> [C]onsider a hypothetical worker, who was 31 years old and graduated from high school, who had the same work experience as Mr. Mattice, who was able to work at all exertional levels, except that the hypothetical worker was limited to simple, repetitive work, was not able to maintain attention or concentration for more than two hours without interruption. Could not interact with the public, and could not have more than occasional interaction with supervisors or co-workers. Would the hypothetical worker be able to perform the claimant's past work?

(Doc. 8, p. 40) The VE replied that "past work would be ruled out . . . ." (Doc. 8, p. 41) When asked wether there was other work the hypothetical worker could do, the VE answered, "Yes," and identified "production helper," "packer," and "store laborer" as jobs that were available in the economy in substantial numbers. (Doc. 8, p. 41) The VE further characterized these jobs as

"medium level of work exertion," each with a SVP[12] of 1.  (Doc. 8, p. 41)

The ALJ then asked the VE, "Would the hypothetical individual be able to perform any of the jobs you identified if instead of being able to have occasional interaction with supervisors and co-workers, [he] was not able to respond appropriately to even minimal interaction with supervisors?" (Doc. 8, p. 41)  The VE replied that such a situation would be "unacceptable" because it "would result in disciplinary measures, reprimands, probations, suspension, and eventually . . . dismissal if . . . not remediated."  (Doc. 8, pp. 41-42)

## C.  The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if he can show his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905.  Corresponding regulations outline the five-step sequential process described below to determine whether an individual is "disabled" within the meaning of the Act.

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability.
>
> Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment.
>
> Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1, then he is deemed disabled.
>
> Fourth, the ALJ determines whether, based on the claimant's RFC, the claimant can perform his past relevant work, in which case the

_____

[12] SVP – Specific Vocational Preparation.  SVP is "the amount of time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance of a job."  *Kyle v. Comm's of Soc. Sec.*, 609 F.3d 847, 851 n. 6 (6th Cir. 2010).  Unskilled work corresponds to a SVP of 1-2.  SSR 00-p, 2000 WL 1898704 * 3 (SSA).  A SVP of "1" is the least demanding in terms of required vocational preparation.

claimant is not disabled.

Fifth, the ALJ determines whether, based on the claimant's RFC, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2014). While the claimant bears the burden of proof at steps one through four, the burden then shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's RFC and vocational profile. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011)(internal quotation marks omitted).

The SSA's burden at the fifth step may be met by relying on the medical-vocational guidelines, known in the practice as "the grids," but only if the claimant is not significantly limited by nonexertional impairment, and then only when "the characteristics of the claimant exactly match the characteristics of one of the rules." *Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). In cases where the grids do not direct a conclusion as to the claimant's capacity, the SSA must come forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through the testimony of a VE. *See Wright*, 321 F.3d at 616 (citing SSR 83-12, 1983 WL 31253 (SSA)). In determining the claimant's RFC for purpose of the analysis at steps four and five, the SSA is required to consider the combined effect of all the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); 20 C.F.R., 404.1523; 404.1545(a)(2); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 726 (6th Cir. 2014).

## III. ANALYSIS

### A. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and

whether it was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374 (internal citations and quotation marks omitted). Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Gentry*, 741 F.3d at 722 (internal citation omitted); *see Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *Gayheart*, 710 F.3d at 374 (internal citation omitted). In other words, "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). On the other hand, an ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion may be justified based upon the record. *Gentry*, 741 F.3d at 722 (internal citations and quotation marks omitted).

### B. Claims of Error

### 1. Whether the ALJ Erred in Finding Only "Moderate" Restrictions in Activities of Daily Living, Social Functioning, and Maintaining Concentration, Persistence, and Pace (Doc. 11, pp. 8-11 of 16)

Plaintiff argues first that the ALJ erred in not "'tak[ing] into account structured settings, ability to function independently, appropriately, effectively, and on a sustained basis, the amount of supervision, and the setting in which [Plaintiff] is able to function as required by 20 C.F.R. § 404.1520a." (Doc. 11, pp. 8-9 of 16) Plaintiff also argues that the evidence "strongly supports a finding that greater-than-moderate limitations are present," and that "the ALJ's determination that the criteria of 12.04B . . . were not met is not supported by substantial evidence." (Doc. 11, pp. 9-11 of 16)

The regulation to which the first part of plaintiff's argument pertains is quoted below in

relevant part:

> Assessment of functional limitations is a complex and highly individualized process that requires us to **consider** multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will **consider** all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including but not limited to, chronic mental disorders, <u>structured settings</u>, medication, and other treatment. . . . . [W]e will **consider** such factors as the quality and level of your overall <u>functional performance</u>, any <u>episodic limitations</u>, the amount of <u>supervision or assistance</u> you require, and the <u>settings</u> in which you are able to function.

20 C.F.R. § 404.1520a(C)(1)-(2)(bold and underline added).

As shown below, the ALJ considered the factors at issue in his analysis of the opinions of Drs. McAlister and Joslin. More particularly, the record shows that the ALJ considered plaintiff's: 1) need for "continued frequent psychotherapy and medication management, preferably with a consistent treating source that he could establish a rapport with over time"; 2) need "for external structure and control that . . . served him well in the Army"; 3) "very fragile stability . . . that would be shattered with any high stress work environment"; 4) need to work in a "low to moderate stress work environment with supportive, non-confrontational supervision"; 6) need to work with "a few familiar co-workers"; 7) inability to "interact directly with the public"; 8) need for feedback "given in a supportive manner"; 9) inability to interact with co-workers and supervisors except only "on an occasional basis"; 10 ) need for "infrequent change" in the workplace; and 11) ability to "maintain attention, concentration, persistence and pace with appropriate breaks despite periods of increased signs and symptoms." (Doc. 8, pp. 16, 18)

In giving Dr. McAlister's opinion "great weight," and "accept[ing]" Dr. Joslin's opinion, the ALJ necessarily gave "great weight" to/"accept[ed]" the considerations enumerated above at p. 18 in his RFC analysis. Because the ALJ did, in fact, consider the factors at issue as required under 20

C.F.R. § 404.1520a, the first part of plaintiff's argument is without merit.

The second part of plaintiff's argument is that the ALJ erred in his determination that the criteria of 20 C.F.R. Pt. 404, Subpt. P, App. 1, ¶ 12.04B were not met. The paragraph B criteria under ¶ 12.04 are met when "at least two of the following" are established:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, ¶ 12.04B.[13]

The ALJ found that plaintiff had "moderate" restrictions/difficulties in activities of daily living, social functioning, concentration, persistence or pace, and that there was "no record of any decompensation of extended duration." (Doc. 8, p. 14) Based on these conclusions, the ALJ determined the following:

> Because the claimant's mental impairment does not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of an extended duration, the 'paragraph B' criteria are not satisfied.

(Doc. 8, p. 14)

As previously discussed above at pp. 11-12, both Drs. McAlister and Joslin reached the conclusion that plaintiff had "moderate" limitations/restrictions in activities of daily living. Dr. Joslin also assessed plaintiff with "moderate" limitations in maintaining social functioning, and Dr. Thompson concurred. Dr. McAlister, in turn, answered "No" to the question was there "total . . .

---

[13]  Plaintiff does not address ¶ 12.04B.4 in his first claim of error.

social impairment due to mental disorder signs and symptoms?" Finally, Dr. McAlister concluded that plaintiff's disorder, signs, and symptoms would not result in work related deficiencies. For their part, Dr. Joslin concluded, and Dr. Thompson concurred, that plaintiff's ability to maintain attention and concentration for extended periods was only moderately limited, and that he would be able to do so with appropriate breaks *despite* any increased signs and symptoms.

The opinions of Drs. McAlister, Joslin, and Thompson constitute substantial evidence in support of the ALJ's determination that plaintiff's limitations/restrictions in activities of daily living, maintaining social functioning, as well as concentration, persistence, or pace were moderate at most. Consequently, the second part of plaintiff's argument is without merit.

### 2. Whether the ALJ Erred in Finding that Plaintiff's Highly-Structured Living Environment, Two Inpatient Mental Health Stays, Medication Management, and Outpatient Therapy Did Not Meet the Requirements of 12.04C.1-3 (Doc. 11, pp. 11-14 of 16)

Plaintiff argues that the "ALJ erred by not considering how the highly-structured living arrangement as an active member of the U.S. Army allows [him] to function on some level but that removal from that environment 'would be predicted to cause the individual to decompensate.'" (Doc. 11, pp. 12-13 of 16) Plaintiff argues that the "ALJ also erred by failing to consider the record as a whole which supports a finding that [his] history of depression and possibly PTSD[14] 'prevents function outside a highly supportive living arrangement, with an indiction of continued need for such an arrangement.'" (Doc. 11, p. 13 of 16)

The provisions of 20 C.F.R. Pt. 404, Subpt. P, App. 1, ¶ 12.04C to which this argument pertains, are quoted below:

---

[14] The record reveals that, PTSD appeared in the record repeatedly as a *possible* diagnosis. (Doc. 8, pp. 229, 288, 324, 330, 334, 351, 359) However, PTSD ultimately was ruled out as a diagnosis. (Doc. 8, pp. 228, 358, 466, 476)

20

C.　Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.　Repeated episodes of decompensation, each of extended duration; or

2.　A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.　Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

The ALJ wrote the following in his decision regarding the paragraph C criteria: "The undersigned has also considered whether the 'paragraph C' criteria are satisfied. In this case, the evidence fails to establish the presence of the 'paragraph C' criteria." (Doc. 8, p. 14) Although the decision is silent as to the ALJ's reasoning, as previously noted at p. 12, Dr. Joslin also reported that the "[e]vidence does not establish the presence of the 'C' criteria." Although Dr. Joslin also does not explain her opinion, as shown below, the ALJ's determination is amply supported on other grounds.

Turning first to the specific terms of ¶ 12.04C, it is apparent that plaintiff has a documented history of a chronic affective disorder for at least two years, that the disorder caused him more than minimal limitations in his ability to engage in basic work activities, and that medication and psychosocial support have been required to attenuate those symptoms. Having satisfied the basic requirement of ¶ 12.04C, the next question is whether plaintiff can satisfy one of the three additional factors enumerated above at p. 21.

Turning first to ¶ 12.04C.1, the regulations provide the following with respect to the

terminology "episodes of decompensation" and "extended duration":

> Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household) or other relevant information in the record about the existence, severity, and duration of the episode.

> The term repeated episodes of decompensation, each of extended duration . . . means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, ¶ 12.00C.4 (emphasis added).

Although the ALJ did not specifically address the question of episodes of decompensation in the context of the paragraph C criteria, as previously noted at p. 19, he did address such episodes in the context of the paragraph B criteria. In that regard, the ALJ wrote that "[t]here is no record of any episodes of decompensation of extended duration." The record supports the ALJ's finding – there is no objective medical evidence in the record of any episodes of decompensation of extended duration as defined above.[15] The ALJ's finding in the context of the paragraph B criteria applies with equal force to the paragraph C criteria.

As noted above at p. 12, Dr. Joslin reported that the "[e]vidence does not establish the presence of the 'C' criteria." On the other hand, Dr. Joslin reported "[o]ne or [t]wo" repeated

---

[15] The two hospitalizations in Germany referred to in the record do not satisfy the "extended duration" requirement under 20 C.F.R. § Pt. 404, Subpt. P, App. 1, ¶ 12.00.C.4. As previously noted at p. 13 n. 11. there is no medical evidence of record to support plaintiff's testimony that he was hospitalized for two weeks in Germany.

episodes of decompensation of extended duration. Dr. Joslin does not identify the episodes to which she refers in her opinion. Nevertheless, taking Dr. Joslin's opinion as true/correct for the sake of argument, it is obvious that "[o]ne or [t]wo" episodes of decompensation cannot equal "three episodes," within 1 year or otherwise, nor do "[o]ne or [t]wo" episodes "average . . . once every 4 months" given the time frame involved in this case.[16] In short, plaintiff cannot establish the requirements of ¶ 12.04C.1 based on Dr. Joslin's opinion that he experienced "[o]ne or [t]wo" episodes of decompensation of extended duration.

Plaintiff argues at length that episodes of decompensation may be "inferred" from his medical records. However, as noted above at p. 22, to *infer* episodes of decompensation from the medical records requires that those records establish one of the following: 1) a "significant alteration in medication"; 2) "documentation of the need for a more structured psychological support system" such as a "hospital, halfway house, or a highly structured and directing household"; 3) or "other relevant information . . . about the existence, severity, and duration of the episode." Plaintiff does not argue that there has been a "significant alteration in [his] medication," nor is there anything in the record that would support such a conclusion. Nor does plaintiff argue that there is "relevant information in the record" about the existence of other episodes of decompensation. Therefore, the only remaining way for the court to *infer* episodes of decompensation from the record is for there to exist "documentation of the need for a more structured psychological support system" which, as noted above at p. 22, the regulation characterizes as a hospital, a halfway house, or a "highly structured and directing household."

Plaintiff relies on the opinion of Dr. McAlister's to support his argument that he requires a

---

[16]   Given that Dr. Joslin's opinion fails to establish the total/average number of episodes required under ¶ 12.04.C.1, it makes no difference whether the episodes at issue "each last[ed] for at least 2 weeks." Again, as previously noted at p. 13, n. 11, there is no medical evidence of record that plaintiff was hospitalized for two weeks in Germany.

more "structured psychological support system." As previously noted at p. 11, Dr. McAlister was of the opinion that plaintiff "would need . . . . continued psychotherapy and med management to function outside the military setting." However, Dr. McAlister did not recommend that plaintiff be hospitalized, placed in a halfway house, or that it was necessary that he live in a highly structured and directing household.[17] Neither is there anything in the record to support the conclusion that the Army, or anyone else for that matter, was of that mind. Absent a documented need for a more structured support system as defined above at p. 22, plaintiff fails to establish that ¶ 12.04C.1 applies based on Dr. McAlister's opinion.

Turning next to ¶ 12.04C.2, although plaintiff refers to this section in the heading of this claim of error, he does not provide law and argument in support of any claim under this section. Therefore, any claim of error under ¶ 12.04C.2 is waived.

Turning finally to ¶ 12.04C.3, the Sixth Circuit does not appear to have addressed the question of what constitutes a "highly supportive living arrangement" in the context of ¶ 12.04C.3. However, the Eighth Circuit has. In *Myers v. Colvin*, 721 F.3d 521 (8th Cir. 2013), the Eighth Circuit held in the context of ¶ 12.04C.3 that "[t]he regulations define 'highly supportive' settings to include hospitals, halfway houses, care facilities and personal home settings that greatly reduce the mental demands placed on [the claimant]." *Myers*, 721 F.3d at 526 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, ¶ 12.00F). Paragraph 12.00F, to which *Myers* cites, reads in relevant part as follows:

> Effects of structured settings. Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial factors such placement in a hospital,

---

[17] Dr. McAlister issued her report in connection the VA/DOD disability evaluation proceedings in plaintiff's case. Therefore, her reference to plaintiff's future need for a structured environment likely was in connection with plaintiff's need/eligibility for VA benefits following his discharge from the Army.

> halfway house, board and care facility, or other environment that
> provides similar structure. Highly structured and supportive settings
> may also be found in [the] home. Such settings may greatly reduce
> the mental demands placed on you. With lowered mental demands,
> overt symptoms and signs of the underlying mental disorder may be
> minimized. . . . [I]dentical paragraph C criteria are included in 12.02,
> 12.03, and 12.04. . . .

Although the regulations do not state so specifically, a plain reading of ¶ 12.00F above – with its internal reference to "structured settings" – supports the Eighth Circuit's determination in *Myers* in the context of ¶ 12.04C.3.

Assuming solely for the sake of argument that plaintiff's two hospitalizations in Germany satisfied the requirements under ¶ 12.04C.3, those two hospitalizations occurred years ago, and totaled only four days – well short of the one-or-more year requirement under ¶ 12.04C.3. There also is nothing in the record that shows that plaintiff lived thereafter in a halfway house, board and care facility, highly structured and supportive home setting, or "other environment that provide[d] similar structure."

Contrary to plaintiff's oft-repeated assertion that life in the Army itself constitutes a "highly-structured living arrangement," the Army is not a hospital . . . it is not a halfway house . . . it is not a board and care facility . . . and it is not a "highly structured and directing household." Army life also cannot be said to provide an "similar structure" to that provided by the foregoing. Indeed, the record supports just the opposite conclusion. As previously noted above at p. 8, plaintiff told Dr. Quintero "that he had 'nothing to do all day at work,' that he did 'not feel useful,' and that he 'literally walk[ed] around all day . . . find[ing] ways to spend his time . . . .'" As previously noted at p. 8, plaintiff specifically identified this situation as the "stressor" that gave rise to his increase in suicidal ideations. As previously noted at p. 13, plaintiff, who was on active duty at the time of the administrative hearing, testified that "he goes to the base in the morning, goes home, and

'do[es]n't do anything.'"  In short, whatever *structure* Army life provided plaintiff, it was not "similar" to that contemplated in 20 C.F.R. Pt. 404, Subpt. P, App. 1, ¶ 12.00F.  Consequently, plaintiff fails to establish that ¶ 12.04C.4 applies.

As shown above, substantial evidence supports the conclusion that the paragraph C criteria do not apply in plaintiff's case.  Accordingly, plaintiff's second claim of error is without merit.

## IV.  RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 10) be **DENIED** and the Commissioner's decision **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file  written objections to the findings and recommendation proposed herein.  A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof.  Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal.  *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 11th day of September, 2014.


/s/ Joe B. Brown
Joe B. Brown
United States Magistrate Judge